[Civ. No. 6163.  First Appellate District, Division Two.—April 11, 1928.]

DAISY C. SHAVER et al., Respondents, v. UNITED PARCEL SERVICE (a Corporation) et al., Appellants.

H. W. Kidd, Walter O. Schell and Gerald F. H. Delamer for Appellants.

Irl D. Brett for Respondents.

THOMPSON (R. L.), J., *pro tem.*—This is an appeal from the verdict of a jury and the judgment of the court awarding $15,000 damages for the death of respondents' intestate, caused by the alleged negligence of appellants in driving their Ford truck into a loaded runaway trailer which had rolled from a gravel bunker adjacent to the highway, into Cromwell Avenue in Los Angeles County. At the time of the accident the decedent was engaged in trying to stop the trailer.

For grounds of reversal the appellants contend that (1) the judgment is not supported by the evidence, (2) that the

testimony fails to show negligence on their part, (3) that the evidence affirmatively establishes contributory negligence on the part of the deceased, and (4) that the court erred in the admission of testimony, in giving and refusing certain instructions and in commenting on the weight of evidence to which an expert witness is entitled.

Cromwell Avenue is a paved street thirty-eight feet wide, extending east and west along the base of the Hollywood hills. A six-foot cement sidewalk borders this avenue on the north, and is elevated above the level of the street about six inches. On the north side of this highway, at a point opposite the place where the accident occurred, the land slopes gradually upward to a gravel pit and sand bunkers owned by William Kerr, which are situated twenty feet from the upper edge of the sidewalk. The soil of the driveway leading to these bunkers consists of loose eroded shale or deteriorated granite. Opposite this driveway the sidewalk was covered with timbers. A plank apron furnished the means of descent from the elevation of the walk to the level of the street. West from the point where the accident occurred, two streets join Cromwell Avenue from the south, but do not extend beyond it. The nearest street to the west is Observatory Avenue, which is thirty feet distant, and Commonwealth Avenue is three hundred feet beyond. Cromwell Avenue, upon which the accident occurred, is perfectly straight in this locality and ascends with a considerable grade from Commonwealth Avenue to the point where the collision occurred. The view from Commonwealth Avenue to the bunkers and the street below is clear and unobstructed.

On February 2, 1924, at about 9 o'clock in the forenoon, the deceased and one Burke were engaged in loading an automobile trailer with gravel at these bunkers. For this purpose the trailer was backed against the bunker, and gravel was deposited in the box by means of a chute which extended half the length of the vehicle, thus loading the front part first, after which the trailer was moved forward in order to load the rear end. The driveway, where the trailer stood, descended slightly to the level of the sidewalk. In spite of this slight grade the trailer would usually stand stationary without blocking the wheels. But because the weight and force of the gravel in the process of loading

would sometimes start the trailer forward, the wheels were blocked by placing a piece of planking three inches thick and a foot in length upon the ground in front of a rear wheel. At the time of the accident Mr. Burke stood in the trailer-box distributing the gravel as it was deposited from the chute. The deceased was engaged outside upon the ground. When the front end of the box had been filled, according to custom, the plank which blocked the rear wheel was kicked forward two or three feet to permit the machine to roll away from the bunker so as to load the rear end. Upon this occasion, however, the block failed to stop the car. The witness Nemmo testified: '' . . . the ground was soft, and the block failed to stop the trailer.'' The weight of the partially loaded car crushed the block into the soil and it rolled slowly on into the street. Upon observing that the block failed to stop the car, the deceased ran ahead of it and attempted to force the end of the tongue which protruded ahead of the car into the earth with his foot. Failing in this effort, standing upon the tongue, he reached for the brake lever at the left side of the box, which he applied with all his strength. While the speed of the car was greatly checked, it nevertheless continued to move forward no faster than a man could walk, and ran into and across Cromwell Avenue at right angles.

About the time this trailer started on its course for the highway, the appellant Faulds drove a Ford truck up Commonwealth Avenue and turned into Cromwell Avenue within plain view of the scene above described not more than three hundred and fifty feet away. He knew of the presence of the bunkers. The runaway trailer was sixteen feet in length and the body was painted red. There was no traffic upon this highway, and nothing to obstruct a clear view of the trailer as it slowly ran across the pathway of the approaching truck. In spite of this evident danger the appellant Faulds drove his car up this grade to the point of impact at a rate of speed variously estimated at from twenty to thirty-five miles an hour. As he reached a point thirty or forty feet from the point of collision his car was seen to turn first sharply to his left as though he were intending to pass behind the trailer, then he appeared to speed up and turn to the right with the evident intent of dashing ahead of the trailer. No horn or other warning of his ap-

proach was given, and there is no evidence that the deceased even knew of his danger.

Mr. Burke, who held his position in the trailer, testified: "Mr. Shaver first stood with both feet on the trailer tongue, trying to push the tongue into the dirt, pulling the brake at the same time to stop it. . . . When he saw he wasn't going to make it that way, he took one foot off the trailer . . . so as to get more pull—more leverage. . . . The truck kept coming on. When the (defendants') truck got to the east side of the center of the street (Observatory avenue) it made a noticeable turn to the left, . . . then it made a turn to the right again, and then straightened its course out. It looked as if the truck slowed down and then speeded up again, and it looked to me as if the driver of the truck tried to get in front of the trailer; and there was not room. . . . Mr. Shaver was standing, at the time of the impact, with his left foot on the trailer tongue and his right foot on the ground walking backward slowly. . . . Mr. Shaver was wedged in between the Ford and the trailer. The Ford had run over the trailer tongue." The appellant Faulds testified: "From Commonwealth east to Observatory I was driving uphill, and continued to drive uphill until the time of the accident. . . . I did not see the bunker, but I knew it was there. I did not see the trailer at all until the time of the impact." In attempting to dash through between the south curbing of Cromwell Avenue and the approaching trailer, it is quite evident the Ford truck struck the protruding tongue of the trailer and knocked the deceased from his position on the tongue, wedging him in between the trailer and the truck. Both machines stopped. The tongue of the trailer extended between the front and the rear wheels of the truck, which was jammed against the south curbing of the street. The trailer had to be shoved back to release the body of the deceased, which then fell to the pavement. He was taken to the emergency hospital and soon died from the effect of the injuries which he had sustained.

██ The appellant Faulds had ample opportunity to avoid the accident. He took a desperate chance, as the result conclusively proved, in attempting to pass ahead of the trailer. He claims to have been traveling only twenty to twenty-five miles an hour, and testified: " . . . at the speed that I was going I could have stopped the Ford between

twenty and twenty-five feet." The deceased was doing his utmost to stop the trailer, and was evidently unaware of the presence of the speeding truck. Observing the predicament of the runaway trailer, and the imminent danger of attempting to pass ahead of it, it was the duty of the driver of the Ford to slacken his speed or stop if necessary to avoid the collision. We are of the opinion that his conduct under the circumstances furnishes ample evidence of negligence on his part. ▮ The question of appellants' negligence and of the charge of contributory negligence on the part of the deceased were matters for the determination of the jury, and we are satisfied that their findings upon these subjects are supported by substantial evidence.

▮ Two of respondents' witnesses were permitted to testify that the driver of appellants' machine, immediately after the accident had occurred, stated: "I got out of this lucky; I could have stopped, but I thought the trailer was going to stop." This testimony was received over the objection of the appellants on the ground that it was incompetent and that it constituted no part of the *res gestae*. Subsequently the court reversed this ruling and struck the evidence out so far as its application to the appellant corporation was concerned, permitting it to stand only as admissions against the appellant Faulds. The court said: "It is received against Faulds (only). The jury is so advised, and will note the (subsequent) instruction (which will be given) with relation to the matter stricken out. . . . The jury is admonished to disregard these statements of the driver as to (their application to) the defendant corporation." Instruction number ten, which was later given, directed the jury that: "You must not consider for any purpose any evidence . . . which has been stricken out by the court. Such evidence is to be treated as though you had never heard it." The statements of the chauffeur of an automobile, made subsequent to an accident in which he is involved, are competent as admissions against the interest of the driver. (*Lampton* v. *Davis Standard Bread Co.*, 48 Cal. App. 116, 119 [191 Pac. 710]; sec. 1872, Code Civ. Proc., subd. 2.) But the admissions of an employee which are not prompted by the excitement of the occasion and are no part of the *res gestae* cannot bind the principal and are incompetent. (*Luman* v. *Golden Ancient Channel M. Co.*, 140 Cal. 700, 709 [74 Pac. 307]; *Kimic* v. *San Jose-Los Gatos*

*etc. Co.*, 156 Cal. 379, 390 [104 Pac. 986]; *Baker* v. *Western Auto Stage Co.*, 48 Cal. App. 283 [192 Pac. 73]; 3 Jones, Com. on Ev. 2217, sec. 1207.) ■ The application of the foregoing admissions was properly limited to the appellant Faulds, and they were properly stricken from the record to the extent to which they may have affected the appellant corporation. ■ It was not prejudicial error to have first admitted the testimony as affecting both appellants since the evidence was subsequently properly limited and the jury was clearly instructed as to its application. (*Shupe* v. *Rodolf*, 185 Cal. 371 [197 Pac. 57]; *Rystinki* v. *Central California T. Co.*, 175 Cal. 336, 342 [165 Pac. 952]; *Atkinson* v. *United Railroads of S. F.*, 71 Cal. App. 82, 97 [234 Pac. 863]; 2 Cal. Jur. 1021, sec. 607.) ■ It is a general rule that the erroneous admission of evidence is cured by its subsequent elimination from the record where the jury is clearly instructed to disregard the testimony. (4 C. J. 989, sec. 2972; Walker's Errors in Civ. Proc. 549, sec. 177.) ■ A jury must be deemed to have understood and observed clear and unambiguous instructions. (*McCollum* v. *Barr*, 38 Cal. App. 411, 429 [176 Pac. 463]; *Johns* v. *Pond*, 38 Cal. App. 643, 649 [177 Pac. 293]; *Kenna* v. *United Railroads*, 197 Cal. 148, 152 [239 Pac. 1061]; 24 Cal. Jur. 763, sec. 44.)

■■ When the respondents' witness Nimmo was first asked regarding the foregoing statement of the appellant Faulds he said that he did not recall the conversation. Over the objection of appellants he was then shown a transcript of his testimony on that subject which was previously given at the coroner's inquest, for the avowed purpose of refreshing his memory. Upon examination of this record the witness asserted that he recalled the incident and then testified to the foregoing statement which conformed to his evidence at the inquest. It is claimed by the appellants that this was error. We are of the opinion, however, that under the circumstances of the present case the ruling was not prejudicial, in spite of the fact that the authentication of the transcript of the evidence adduced at the coroner's inquest was not first established, for the reason that Mr. Burke, another witness, testified to precisely the same statement, and the evidence complained of was therefore merely cumulative. For the purpose of refreshing the memory of a witness it is competent to read or exhibit to him a transcript of

his testimony respecting the same subject matter, given at a former hearing or trial, after the record has been first proved to be true and correct. (*People* v. *Mercado,* 59 Cal. App. 69, 74 [209 Pac. 1035]; sec. 2047, Code Civ. Proc.; 5 Jones Com. on Ev. 4689, sec. 2386; 2 Hyatt on Trials, 1186, sec. 1246.)   This rule, however, is for the purpose of awakening a dormant memory and stimulating present recollection or circumstances sought to be elicited.   The former testimony may not be received as proof to establish a fact in the present case, except that pursuant to the exercise of great caution a witness may be permitted to testify from a writing made by him or under his direction in accordance with the requirements of section 2047 of the Code of Civil Procedure, even though he may retain no recollection of the particular facts.   The authenticity of a record from which a witness is permitted to refresh his memory should, however, be first established.   Since the ruling complained of in the present case affected only evidence which was cumulative, it was harmless and did not constitute prejudicial error. (*Siemon* v. *Finkle,* 190 Cal. 611, 618 [213 Pac. 954]; 2 Cal. Jur. 1020, sec. 607.)

It is contended that the court invaded the province of the jury in commenting upon the weight to be given to the testimony of an expert witness.   William Kerr, the owner of the bunkers in question, testified that he was an architect and builder and that he had taken certain measurements "with tape lines and straight edges" from which he prepared the diagram which was received in evidence.   In opposition to this testimony the appellants called Mr. Borders whom they sought to qualify as an expert engineer.   While it appeared that he had taken the engineering course at the Kansas University for two years, he was not a graduate of any institution, and his experience consisted of three years' service in the army and in establishing railroad grades, during which he acted as a transit or level man.   However, the court assumed that he was qualified as an expert, and over the objection of respondents upon that ground, he was permitted to answer the question, "Does the use of a transit give you more accurate information than the use of angles?"   This was for the evident purpose of discrediting the measurements testified to by Mr. Kerr, but our attention is not called to any figures wherein it is claimed the data secured by these gentlemen differed in any respect.   Borders

testified to no other material fact. It is manifest that if his measurements did not differ from those from which Mr. Kerr prepared his diagram, there would be no prejudice even if the court's remarks respecting an expert were indiscreet. However, we are disposed to think they are scarcely open to this criticism. In permitting the answer to that question the court said: "I will allow the testimony. The jury don't have to accept that—the statements of an expert. An expert is for the purpose of assisting the jury in reaching their conclusions, and if the statements of the witness do not appeal to their sound judgment, they do not have to accept it." The court then added: "I have prepared an instruction (regarding the weight to be given to the opinions of experts) which I will give to you so that you can govern yourselves regarding (the consideration of) expert testimony." The instruction to which the court referred was in fact given as follows: "The opinions of experts are not conclusive; their opinions are not to be substituted for the common sense and judgment of the jury. The purpose of the introduction of such evidence is to supplement the general knowledge and experience of the jury in relation to the matters before the jury, and thereby to aid the jury in the exercise of its own judgment to the end that a more just and accurate conclusion may be drawn from the evidence." The jury was further instructed that, "Neither the judge nor the jury may trespass upon the province of the other. Our provinces are entirely distinct and separate, and you will understand that in this charge the court in no manner or form is expressing or desiring to express any opinion on the weight of the evidence, or any part of it, or on the truth or falsity of any witness' testimony, or that any alleged fact in the case is or is not proved."

The question which prompted the remarks of the court which were criticised by appellants, to wit: "Does the use of a transit give you more accurate information than the use of angles," seems unintelligible. It would appear to require something more than the wisdom of an expert engineer to answer this question. Probably it was the intention to ask this witness whether the use of a transit would furnish more accurate measurements for a diagram than would the use of a straight-edge and tape-line. A surveyor's transit is used for measuring distances and horizontal angles. (Cent. Dict.) A straight-edge and tape-line may be used

for the same purpose. Common knowledge should teach the nonexpert that the transit is more reliable. It may therefore be doubtful whether this inquiry is a proper subject for expert testimony. But assuming that it was a proper, intelligible question, and that the testimony of these expert witnesses conflicted with respect to their measurements, we nevertheless think that the remarks of the court were not prejudicial. The effect of the court's language inferred that whatever may be the answer of the witness to this unanswerable question, the jury is not bound to accept the reply unless it appeals to their sound judgment. In the instruction which followed this remark, the court merely said that the opinions of experts were not to be substituted for common sense and sound judgment, and that their opinions were not necessarily conclusive. This instruction was coupled with the explicit statement that the court had no right or disposition to pass upon either the weight of the evidence or the credibility of the witnesses, but that these matters were within the sole province of the jury. Certainly, under such circumstances, the jury could not have been misled into believing that the court was discrediting the testimony of this expert witness. ▮ What was said respecting the evidence of experts would apply with equal force to the testimony of any other witness. Since the jury is the sole judge of the weight of evidence and the credibility of witnesses, it follows that ordinarily the jury is not bound to accept statements which are not in accord with common sense or sound judgment. And it is equally true that the testimony of a witness is not necessarily conclusive.

▮ The giving of instructions upon commonplace matters of which the jurors are presumed to be cognizant, or even reasonably cautionary instructions, is not ground for reversal in the absence of a showing of prejudice. (2 Cal. Jur. 1027, sec. 611, and authorities there cited.) ▮ It is true that expert testimony, when competent and admissible, like the evidence of any other witness, should be permitted to go to the jury without disparagement, leaving them to pass upon its weight and sufficiency. (*Estate of Hess*, 183 Cal. 589, 593 [192 Pac. 35]; Abbott's Trials, 4th ed., 765, sec. 47.) Under the circumstances of the present case, however, we are of the opinion that the province of the jury

was not invaded by the declarations of the court and that its remarks were not prejudicial.

█ Nor was there error in the court's sustaining respondents' objection to a question propounded to Mr. Kerr on cross-examination regarding the effect of the wooden ramp which covered the sidewalk, upon the movements of the trailer in crossing it upon former occasions. No special reason for eliciting this evidence is suggested. It does not appear how his answer would have affected the result in the present case, or that it would throw any light on the circumstances surrounding the accident.

█ In their brief the appellants complain of the court's refusal to give, or its modification, of, some forty-two instructions offered by them. The bill of exceptions sets out eighty-nine instructions in consecutive order, but fails to indicate which of them, if any, were refused or modified, how they were modified, or by whom they were offered. All that the bill of exceptions contains in this regard is the following: "The defendants thereupon tendered to the court the following written instructions, and requested that (they) be given. The court then refused to give the following (one) instruction (to-wit) 'You are instructed to return a verdict in favor of the defendants.' The court then and there refused to give the remaining instructions, except as otherwise given in the instructions by the court." If the record fails to disclose the party at whose request the instructions were given, it will be presumed they were offered by the appellant, in which event he may not complain of any errors therein contained. (*Sutter-Butte C. Co.* v. *American R. & A. Co.*, 182 Cal. 549, 554 [189 Pac. 277]; *Gray* v. *Eschen,* 125 Cal. 1, 5 [57 Pac. 664]; *Bognuda* v. *Pearson,* 71 Cal. App. 105, 110 [234 Pac. 857]; 2 Cal. Jur. 870, sec. 509.) The last paragraph of the bill of exceptions preceding the instructions which appear therein, is ambiguous and unintelligible. But from the first paragraph above quoted, to wit, that "the defendants thereupon tendered to the court the following written instructions, and requested that they be given," leaves the inevitable conclusion that the defendants offered all the instructions which appear in the bill of exceptions. With the exception of the first instruction above quoted, the authenticated record does not show that any of these instructions were either modified

or refused. Since it is utterly impossible for this court to ascertain what instructions, if any, were modified or refused, or which ones were offered by the respondents, it must be assumed that they were all given at the request of the appellants who may therefore not complain of any errors which they may contain.

For the foregoing reasons the judgment is affirmed.

Koford, P. J., and Nourse, J., concurred.

A petition by appellants to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on June 6, 1928.

All the Justices concurred.